IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MARLENE PARKER,

                Plaintiff,

    v.                              1:08-CV-00528 (GLS/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

ERWIN, McCANE & DALY           THOMAS C. ERWIN, ESQ.
23 Elk Street
Albany, New York 12207

FOR DEFENDANT:

HON. ANDREW T. BAXTER         ELLEN E. SOVERN, ESQ.
United States Attorney             Special Assistant U.S. Atty.
Northern District of New York
Post Office Box 7198
100 South Clinton Street
Syracuse, New York, 13261-7198

SOCIAL SECURITY ADMINISTRATION   MARY ANN SLOAN, ESQ.
OFFICE OF THE REGIONAL           Acting Chief Counsel
GENERAL COUNSEL, Region II       THOMAS GRAY, ESQ.
26 Federal Plaza - Room 3904      Assistant Regional Counsel
New York, New York 10278

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Marlene Parker, who suffers from spondylosis in her cervical spine and asthma in combination with chronic obstructive lung disease, has commenced this proceeding pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's denial of her application seeking disability insurance benefits ("DIB") under the Social Security Act ("Act"). Plaintiff claims that the finding of the administrative law judge ("ALJ") assigned by the agency to hear and determine the matter, to the effect that she was not disabled at the relevant times and therefore ineligible for DIB payments, is not supported by substantial evidence.  Specifically, plaintiff asserts that the ALJ's finding concerning her residual functional capacity ("RFC"), upon which the finding of no disability hinges, is not supported by substantial evidence and results from the improper rejection of her subjective statements regarding her limitations.  Plaintiff also contends that the finding that she is capable of performing her past relevant work as a tax withholding clerk ignores significant limitations which preclude her from performing a full range of the duties associated with that position.

Having carefully reviewed the record that was before the agency,

applying the requisite deferential standard, I find that the Commissioner's determination resulted from the application of proper legal principles and is supported by substantial evidence.

I.    BACKGROUND

Plaintiff was born in September of 1950, and was fifty-seven years old at the time of her administrative hearing before the agency. Administrative Transcript at pp. 43, 275.[1]  Ms. Parker is married and resides with her husband principally in Valley Falls, New York, although the two spend winters together in Florida.  AT 35, 129, 274.  Plaintiff completed high school in 1968 and underwent additional, specialized job training in 1988.  AT 41, 277-78.

Plaintiff's most recent significant period of employment was with the New York State Department of Taxation and Finance, where she worked from February 1, 1986 through October 12, 2004.[2]  AT 36.  Over the last four to five years of her employment with the State, plaintiff worked as a

_____

[1]      Portions of the Administrative Transcript, Dkt. No. 7, filed by the Commissioner and comprised principally of the medical records and other evidence before the agency when its decision was made, will be cited in this report as "AT ___."

[2]      Plaintiff's earning records for 2005 reflect income part of which is attributable to a three to four week period when she unsuccessfully attempted to return to work after her claimed October, 2004 disability onset date.  AT 29, 279.  Addressing that period, the ALJ concluded that the income generated was not sufficiently significant to qualify that endeavor as substantial gainful activity.  AT 15.

taxpayer call center service representative.  *Id.*  Plaintiff reported that in that position she provided customer service, answering taxpayers' questions, making referrals as necessary, and entering data on a computer describing the actions taken to address questions.  AT 36, 46-47, 280-81.  In that position plaintiff was required to sit for five hours and stand for one hour each day, but did not climb, stoop, kneel, crouch, or crawl.  AT 47, 282.  Ms. Parker stated that in that job she was required to lift less than ten pounds at a time.  AT 47.

Prior to her work as a service representative, plaintiff was employed as a magnetic media and payroll services wage reporting unit calculation clerk.  AT 46, 48, 231.  In that position, she sat and answered telephone calls, and conducted computer research of technical questions regarding the withholding of taxable wages.  AT 48, 284.  Plaintiff testified that the position involved "a lot of paperwork" and that she sat and wrote, and typed, or handled small objects for five hours out of the work day while she walked, stood, stooped and handled larger objects for a half hour out of each work day.  AT 48, 283.  Plaintiff reported that the heaviest weight she was required to lift in that job was ten pounds, and that she frequently lifted less than ten pounds.  AT 48.

Before assuming her position as a calculation clerk, plaintiff worked in the department's payment processing unit, where she answered technical questions posed by taxpayers and payroll services. AT 46, 49, 231. In that position plaintiff sat and wrote, and typed, or handled small objects for five hours out of the work day, while she walked and stood for a half hour out of each work day. AT 49. As a calculation clerk plaintiff was required to lift less than ten pounds. AT 49.

Plaintiff also worked as a member of the Taxation and Finance payment processing unit, where she worked as a data entry operator prior to her assignment to the calculation clerk position. AT 51. While in the payment processing unit, plaintiff was required to sit for six hours and walk for a half hour out of the work day. *Id.*

Over time, plaintiff has sought and obtained treatment for two distinct physical conditions, including a neck disorder and a respiratory condition diagnosed as asthma with chronic obstructive pulmonary disease ("COPD"). Plaintiff's neck condition began with symptomology suggesting work-related carpal tunnel syndrome. Plaintiff was examined on May 6, 2004 by Dr. Ralph Quade, an orthopedist, complaining of cramping in her hands which coincided with driving or activities entailing

repetitive motions.  AT 100.  Upon examination, Dr. Quade found plaintiff

to be positive for Phalen's sign but negative for Tinel sign, with intermittent

numbness in the median nerve distribution but no thenar wasting, and a

full range of motion in her wrist.[3]  AT 100.

A later examination conducted by Dr. Quade on September 15,

2004 again revealed plaintiff's left hand to be positive for Phalen sign and

negative for Tinel's sign, with her right hand negative for both.  AT 96.  On

October 19, 2004, Dr. Quade noted that a nerve conduction study failed to

reveal the existence of carpel tunnel or ulnar neuropathy, but suggested

the possibility of lower cervical radiculopathy.  AT 94.

Upon referral from Dr. Quade, plaintiff underwent magnetic

resonance imaging ("MRI") testing on October 20, 2004.  AT 110.  The

MRI revealed "[m]ild, multilevel degenerative disc disease," with no

evidence of disc protrusion, herniation or central stenosis.  *Id.*  The MRI

---

[3]    Phalen's maneuver is used in the detection of carpal tunnel syndrome; the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for thirty to sixty seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure for thirty to sixty seconds.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1117 (31st ed. 2007).

Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning of regeneration of the nerve.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1741 (31st ed. 2007).

6

also disclosed a narrowing of the neural foramina at C3-4, greater on the right side.  *Id.*  Noting that both the results of the MRI and left nerve conduction studies showed radiculopathy, on October 26, 2004 Dr. Quade observed that he was "at a loss to determine the etiology of [plaintiff's] symptoms, or what the effective treatment would be . . .".  AT 93.

Plaintiff was referred for consultation to Dr. Kevin Mullaney, an orthopedist practicing with the Capital Region Orthopaedic Group, where she was seen beginning on December 23, 2004.  AT 111-16.  Dr. Mullaney diagnosed plaintiff as suffering from cervical spondylosis, but without any signs of radiculopathy, myelopathy, or cauda equina and referred her for epidural steroid injections.  AT 116.  In the interim, Dr. Mullaney recommended that plaintiff not work, given the apparent unavailability of light duty jobs at her prior employment.  AT 112-16.  During the ensuing visits, Dr. Mullaney noted that plaintiff appeared to be responding favorably to the steroid injections as well as to Lidoderm patches prescribed for her by her primary care physician.[4]  AT 113.  During her last reported visit with Dr. Mullaney on May 25, 2005, plaintiff

---

[4] Lidoderm is a preparation of lidocaine, a drug having anesthetic, sedative, analgesic, anticonvulsant and cardiac depressant activities, which is used as a local anesthetic and is applied topically to the skin.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1048 (31st ed. 2007).

was prescribed a soft cervical collar, and it was recommended that she be evaluated by a specialist to affix a percent disability rating.[5]  AT 111.

Plaintiff was also treated for her neck condition by Dr. Andrew C. Messer, a Florida orthopedist who examined her on January 10 and January 24, 2007.  AT 261-63.  Upon examining the plaintiff, Dr. Messer noted that she did not appear to be any acute distress, nor did she exhibit any abnormal posturing of her neck.  AT 262.  Dr. Messer also observed that plaintiff retained a full range of motion of both shoulders and was neurovascularly intact in her upper extremities, with the exception of decreased C6 biceps reflex bilaterally.  AT 263.  Dr. Messer found no evidence of cubital tunnel or carpel tunnel disease, but did note that she was positive for Spurling's maneuver bilaterally.[6]  *Id.*  Dr. Messer further observed that plaintiff had "soft tissue discomfort to palpation, but no

---

[5]     Plaintiff's efforts to consult with a Dr. Musto for that purpose were unsuccessful since his office did not accept her insurance and based upon her apparent inability to absorb the proposed $500 charge for the testing.  AT 111.  It was noted in his report of the May 25, 2005 visit that Dr. Mullaney was recommending workers' compensation approval of a consultation for plaintiff's review with Dr. Musto or a Dr. Cole for purposes of determining the extent of her disability.  AT 111.

[6]     A positive result for Spurling's test, or foraminal compression test, suggests cervical radiculopathy.  http://emedicine.medscpate.com/article/94118 [last viewed 10/19/2009].  Disclaimer: the United States District Court of the Northern District of New York does not maintain responsibility for the content of this Internet resource or its current viability at the URL provided.

muscle guarding or rigidity over the posterior neck, medial scapular and suprascapularis tendon areas bilaterally.  *Id.*  Dr. Messer noted that his review of x-rays showed a "grade I spondylolithesis of C3 on C4 . . . [and] degenerative changes at C5-6."  AT 263.  MRI testing conducted on January 12, 2007, on referral from Dr. Messer, revealed "mild to moderate degenerative cervical spondylosis, most pronounced at C5-C6 where [a] central to left paramedian protrusion with uncovertebral and facet joint arthropathy create mild spinal canal stenosis with left-sided neural foraminal and lateral recess stenosis."  AT 228.  The results of that MRI also revealed that mild spinal cord edema may have been present at the C5-C6 level.  *Id.*

After reviewing the results of the MRI testing and conducting an examination of the plaintiff, Dr. Messer discussed with her the large left C5-C6 herniated nucleus pulposus, explaining that it was "most likely causing her discogenic neck pain [and] cervicogenic headaches . . . .".  AT 261.  Based upon those findings Dr. Messer recommended that the plaintiff consider an anterior cervical discectomy and fusion at C5-6, and prescribed Darvocet for her pain.[7]  *Id.*

_____

[7]     Darvocet is a preparation of the napsylate salt of propoxyphene, an opioid analgesic structurally related to methadone, and acetaminophen used for pain

In addition to her treating sources, plaintiff was examined consultatively on July 18, 2005, by Dr. Amelita Balagtas for purposes of determining her orthopedic condition.  AT 129-31.  In a report of that examination, which was significantly noncommittal, Dr. Balagtas recorded an impression of "[b]ack pain, rule out degenerative disk disease and rule out musculoskeletal origin," and reported plaintiff's prognosis as "undetermined".  AT 131.  Based upon the evaluation, including plaintiff's subjective statements regarding her limitations, Dr. Balagtas concluded that plaintiff would experience some limitations in bending, lifting, prolonged sitting, and prolonged standing, but provided no quantification or further specifics.  *Id.*

Plaintiff, a smoker, has also been treated over time for asthma and COPD.[8]  X-rays of plaintiff's chest taken on March 22, 2004 revealed that her lungs were not hyperinflated, showed that there was apical oligemia

---

relief.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 479, 1551 (31st ed. 2007).

[8]      Although the available medical records suggest that over time she has smoked with decreasing frequency, they are somewhat conflicting regarding the extent of plaintiff's smoking.  One treatment note from April of 2004, for example, indicates that at that point she had smoked two packs of cigarettes per day since 1980, while another from October of 2004 notes that she smokes one pack of cigarettes per day, and yet another from December of 2004 reflects that she has smoked a half-pack of cigarettes per day for the last fifteen to twenty years.  *Compare* AT 204, 207 *with* AT 209A *and with* AT 115.  In July of 2005, treatment notes record that plaintiff was then smoking one-half of a pack of cigarettes per day.  AT 215.

and central peribronchial cuffing, and reflected no focal airspace disease
and no pleural effusions.  AT 80.   Shortly thereafter, on April 19, 2004,
plaintiff presented with complaints of dyspnea and chest tightness to Dr.
Joseph Farooq of Pulmonary and Critical Care Services, P.C. in Troy,
New York.  AT 204-06.  Based upon his examination Dr. Farooq
concluded that plaintiff suffers from COPD, with marked air trapping,
dyspnea of unclear etiology, nicotine dependence, and hypertension.  *Id.*
Noting that her COPD management appeared to be adequate and that at
that point she was smoking two packs of cigarettes a day, Dr. Farooq
opined that smoking cessation would likely be the key to the success of
her therapy.  *Id.*  Dr. Farooq's reports of subsequent physical
examinations of the plaintiff substantiate that her COPD is both modest in
nature and well controlled.  *See, e.g.* AT 207 (reporting on June 18, 2004
that plaintiff's breathing was "quite improved"); AT 212 (reporting on
January 4, 2005 that plaintiff seemed to be "doing quite well" . . . [and
was] essentially asymptomatic"); AT 218 (reporting on July 12, 2006 that
plaintiff was feeling better and "had no real COPD exasperation since her
last visit.")

     Both in reports to the agency and during the hearing in this matter,

the plaintiff described her typical daily activities.  Plaintiff reported that she

tends to her own personal hygiene, washes dishes, walks three hundred

feet to her mother's residence, cleans a swimming pool area, and

prepares easy meals, most of the time with her husband.[9]  AT 58-59.

Plaintiff is able to launder and hang her clothes to dry, dust, and vacuum a

room a day at her residence.[10]  AT 60.  She is able to shop for groceries

on a weekly basis, but requires assistance lifting the grocery bags.  AT 61,

301.  Plaintiff identified reading, watching television and walking as daily

hobbies and interests.  AT 61.  Plaintiff also enjoys swimming, collecting

antiques and using her computer to email.   AT 61.  She is able to visit

with family and babysit for her grandchildren on a weekly basis.  AT 62.

Ms. Parker also reported attending functions at the local post of the

Veterans of Foreign Wars twice weekly as well as dances, although she

cannot remain on the floor for longer than three dances.  AT 62.

II.   PROCEDURAL HISTORY

    A.   Proceedings Before The Agency

---

[9]   Plaintiff later testified, however, that her husband does "all the cooking" and that while she can do small things, such as flipping an egg, she cannot peel or chop anything.  AT 322-23.

[10]   Plaintiff later testified that her husband does "most of the vacuuming." AT 323.

On June 15, 2005, plaintiff protectively filed an application for DIB payments, alleging a disability onset date of October 12, 2004.  AT 21, 36. That application was denied on August 24, 2005.  AT 13, 21.

At the plaintiff's request, on June 7, 2007 a hearing was held before ALJ Robin Artz to address her request for benefits.  AT 268-326. Following that hearing ALJ Artz issued a decision dated September 20, 2007, finding that the plaintiff was not disabled within the meaning of the Act and therefore denying her application for DIB.  AT 10-20.

In that decision, ALJ Arzt applied the now familiar five-step test for determining disability.  After noting that plaintiff retains insured status under the Act up through December 31, 2010, ALJ Artz found at step one that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  AT 15.  At step two, the ALJ concluded that plaintiff's neck disorder, described as cervical spondylosis, and her asthma with COPD, sufficiently interfere with her ability to perform basic work activities as to qualify as severe at step two, but that those impairments do not, either singly or in combination, meet or medically equal any of the listed, presumptively disabling impairments set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 15-16.

13

Before proceeding to step four of the governing test, ALJ Arzt surveyed the available records and testimony in order to determine plaintiff's RFC, concluding that despite her medical conditions, she retains the capacity to perform a wide range of sedentary work with certain minor non-exertional limitations.  AT 16.  Applying that RFC finding, ALJ Artz determined at step four of the disability algorithm that plaintiff is capable of performing her past relevant work, as she had described it, and therefore found it unnecessary to proceed to step five of the sequential analysis, at which the burden would have shifted to the Commissioner.  AT 19.  The ALJ therefore concluded that plaintiff was not under a disability, as defined in the Act, at any time from October 12, 2004 through the date of decision.  *Id.*

The ALJ's opinion became a final determination of the agency on April 1, 2003, when the Social Security Administration Appeals Council denied plaintiff's request for review of that decision.  AT 4-5.

B.    This Action

Having exhausted the administrative remedies available to her within the agency, plaintiff commenced this action on May 20, 2008.  Dkt. No. 1. Issue was thereafter joined on August 12, 2008 by the Commissioner's

filing of an answer, Dkt. No. 8, preceded by submission of an

administrative transcript of the evidence and proceedings before the

agency.  Dkt. No. 7.  With the filing of plaintiff's brief on September 26,

2008, Dkt. No. 9, and that on behalf of the Commissioner on November 7,

2008, Dkt. No. 11, the matter is now ripe for determination and has been

referred to me for the issuance of a report and recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(d).  *See also* FED. R. CIV. P. 72(b).[11]

III.    DISCUSSION

    A.    Standard of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal*

---

[11]    This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

*v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F.Supp.2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the ALJ has applied the correct legal standards and substantial evidence supports the ALJ's findings, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F.Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must

be "'more than a mere scintilla'" of evidence scattered throughout the

administrative record. *Richardson*, 402 U.S. at 401 (quoting *Consolidated

Edison Co.*, 308 U.S. at 229, 59 S.Ct. at 219); *Martone*, 70 F.Supp.2d at

148 (quoting *Richardson* ).  "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court

considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also

include that which detracts from its weight." *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

When a reviewing court concludes that an ALJ has applied incorrect

legal standards, and/or that substantial evidence does not support the

agency's determination, the agency's decision should be reversed.  42

U.S.C. § 405(g); *see Martone*, 70 F.Supp.2d at 148.  In such a case, the

court may remand the matter to the Commissioner under sentence four of

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to

develop a full and fair record or to explain his or her reasoning. *Martone*,

70 F.Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record, and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

   B.   <u>Disability Determination-The Five-Step Evaluation Process</u>

   The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work.  For the

> purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy" means
> work which exists in significant numbers in the region where
> such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaging in substantial gainful activity; if so, then the

claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§

404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then

the second and third steps involve an examination of whether the claimant

has a severe impairment or combination of impairments which significantly

restricts her physical or mental ability to perform basic work activities.  *Id.*

§§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an

impairment, the agency must next determine whether it meets or equals

an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d),

416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the

claimant is "presumptively disabled."  *Martone*, 70 F.Supp.2d at 149 (citing

*Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§

404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F.Supp.2d at 150.

  C. <u>The Evidence In This Case</u>

   1. <u>RFC</u>

Pivotal to the ALJ's finding of no disability was a determination regarding plaintiff's RFC.  Based upon a review of the record ALJ Arzt

20

concluded that plaintiff retains the capacity to perform a full range of

sedentary work, noting that she

> has the ability to sit for up to [six] hours and stand or walk for
> up to [two] hours in an eight-hour day, and occasionally lift,
> carry, push, or pull objects weighing up to [ten] pounds.
> Sedentary work and sedentary work activity involves lifting no
> more than ten pounds at a time and occasionally lifting or
> carrying articles such as docket files, ledgers, and small tools.
> Most unskilled sedentary jobs require use of the hands and
> fingers for repetitive actions.  Although a sedentary job is
> defined as involving sitting, a certain amount of walking and
> standing often is necessary to carry out job duties.  Jobs are
> sedentary if walking and standing are required occasionally
> and other sedentary criteria are met.  The total period for
> standing and walking is not more than two hours in an eight-
> hour work day, and there is at least six hours of seated work.
> There is no significant stooping.  Driving and operation of
> machines with foot and/or knee controls is not sedentary work
> . . . . As a result of non-exertional environmental limitations,
> the claimant requires a reasonably clean air environment that
> is reasonably free from temperature and humidity extremes.

AT 16.[12]  Plaintiff contends that in determining her RFC the ALJ failed to

---

[12]   The governing regulations define sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at
> a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a sedentary job is
> defined as one which involves sitting, a certain amount of
> walking and standing is often necessary in carrying out job
> duties. Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a) and 416.967(a).  In addition, a subsequent ruling has
clarified that sedentary work generally involves periods of standing or walking for a
total of two hours in an eight hour work day, with sitting up to a total of approximately

properly evaluate the medical evidence of record.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue. 20 C.F.R. §§ 404.1545(a), 416.945(a). Consideration of a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis, inform an RFC determination. *Id.*; *Martone*, 70 F. Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess his or her exertional capabilities, including his or her ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. §§ 404.1545(b), 404.1569a, 416.945(b), 416.969a. An ALJ must also consider nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations. 20 C.F.R. §§ 404.1545(b), 404.1569a, 416.945(b), 416.969a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). When making an RFC determination, an ALJ must

---

six hours in a similar period. *See* Social Security Ruling ("S.S.R.") 83-10, 1983 WL 31251, Titles II and XVI: Capability To Do Other Work-The Medical-Vocational Rules of Appendix 2 (S.S.A.1983).

specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F.Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 588) (other citations omitted). An administrative RFC finding can withstand judicial scrutiny only if substantial evidence in the record supports each requirement listed in the regulations. *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F.Supp. 180, 183 (N.D.N.Y. 1990) (McAvoy, J.)); *Sobolewski v. Apfel*, 985 F.Supp. 300, 309-10 (E.D.N.Y. 1997).

Plaintiff argues that she suffers from limitations that result from the combination of her cervical neck condition, COPD, and the side affects of her various medications, including in her ability to sit for six hours in an eight-hour work day, as concluded by the ALJ, to walk for up to two hours in an eight-hour work day, and to use her hands and fingers for repetitive actions. Plaintiff also submits that the ALJ's RFC finding hinges upon a credibility determination, rejecting her subjective testimony concerning her limitations, that is not supported by the record.

### a)    Neck Impairment

In finding that plaintiff retains the RFC to perform sedentary work, the ALJ relied principally upon the treatment notes of Dr. Messer.  Noting

that Dr. Messer is a specialist, the ALJ accorded his clinical notes "substantial weight."[13]  AT 18.  The ALJ noted that despite plaintiff having reported debilitating pain unresponsive to multiple treatments, upon physical examination Dr. Messer found that the plaintiff was in no acute distress, did not have any abnormal posturing to her neck, and had full range of motion in both shoulders, though with a decreased C6 biceps reflex bilaterally.  *Id.*  The ALJ also noted that Dr. Messer's review of x-rays revealed grade I spondylolisthesis of C3 and C4 and degenerative changes at C5-C6.  *Id.*  The ALJ further cited Dr. Messer's review of MRI testing of plaintiff's cervical spine conducted in January of 2007, revealing a large C5-C6 herniated nucleus pulposus, which he believed was the most likely cause of plaintiff's discogenic neck pain.  *Id.*  Dr. Messer recommended an anterior cervical discectomy and fusion at C5-C6.  AT 18; *see also* AT 261-63.

Additionally, the ALJ emphasized Dr. Schreiber's findings from an MRI conducted of plaintiff's cervical spine in October of 2004, upon referral from Dr. Quade.  AT 19.  That testing revealed only mild,

---

[13]     The regulations generally afford "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(d)(5).

multilevel degenerative disease with no evidence of disc protrusion,

herniation, or central stenosis.  *See* AT 110.   The ALJ noted that the MRI

results also showed mild cervical straightening, possibly reflecting a mild

neck spasm.  AT 17; *see* AT 110.

The ALJ also considered Dr. Mullaney's treatment notes, which lend

further support to the ALJ's RFC determination.  AT 19.  In December of

2004, Dr. Mullaney assessed plaintiff as suffering from cervical

spondylosis at C5-C6, but found that her cervical spine had a "mildly

diminished" range of motion, her gait was normal, and her upper extremity

strength was five out of five.  AT 19, 116.  Similarly, in January of 2005,

Dr. Mullaney's physical examination of plaintiff revealed a "decreased

range of motion of the cervical spine," but no evidence of radiculopathy or

tension, and normal gait.  AT 114.  The ALJ also noted Dr. Mullaney's

examination of plaintiff from May of 2005, which revealed "no clear-cut

radiculopathy, myelopathy, or cauda equina."  AT 19, 111.

The ALJ's RFC determination finds additional support in the

treatment notes of Dr. Seltzer.  AT 233-59.  When plaintiff first treated with

Dr. Seltzer in January of 2006, she had "no specific complaints or

concerns other than an upper respiratory infection."  AT 245.  Similarly,

when the plaintiff saw him in November of 2006 for a "yearly physical and recheck," notably absent from her medical history was any mention of neck or back pain.  AT 235.

It is true that although there were no concrete boundaries specified, plaintiff's argument finds some modest support in the consultative report of an orthopedic examination conducted by Dr. Balagtas, who concluded that plaintiff "would have some limitations in activities that require bending, prolonged sitting, and prolonged standing."  AT 131.  In his decision the ALJ specifically considered but rejected the consultative report of Dr. Balagtas as entitled to little weight.  AT 18-19.  Notably, the regulations specify that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(d)(4).  The ALJ's finding that Dr. Balagtas' conclusion, to the effect that plaintiff is limited in her ability to sit, appears to "rely heavily on plaintiff's subjective reports rather than on the essentially normal clinical and diagnostic findings," AT 19, is consistent with the regulations and the evidence in the record.

In sum, the medical evidence in the record related to plaintiff's cervical neck condition provides the requisite support for the ALJ's

conclusion that her neck condition does not significantly interfere with her

ability to perform the range of work specified in the RFC finding.

b)   Asthma/COPD

In addressing plaintiff's asthma and COPD, the ALJ relied heavily

upon the records of Dr. Farooq, plaintiff's treating pulmonologist, as well

as those of Dr. Seltzer.  AT 18.  The ALJ noted that Dr. Farooq's clinical

records from April of 2004 through June of 2007 reflect that plaintiff

suffers from COPD.  *Id.*  In particular, the ALJ cited Dr. Farooq's treatment

records from June of 2007, which indicate that plaintiff's lungs are clear

but that she has "increased AP diameter" and decreased air entry.  AT 18,

222.  Dr. Farooq's treatment notes also show, however, that plaintiff has

improved over the course of her treatment, AT 207, 209, describing her

COPD as stable, AT 216, or moderate, AT 219, 222, and stating that she

is "essentially asymptomatic."  AT 212.  The ALJ further observed that Dr.

Seltzer's clinical records from January of 2006 through April of 2007 show

that plaintiff's lungs were clear on all occasions, with the exception of mild

wheezing in November of 2006.  AT 18; *see* AT 235.  Substantial

evidence thus supports the ALJ's finding that plaintiff's COPD results in

only minimal limitations such that she requires a workplace with a

"reasonably clean air environment that is reasonably free from temperature and humidity extremes."  AT 16.

In sum, I conclude that the ALJ's RFC determination was both properly explained and is supported by substantial evidence in the record.

### 2.   Credibility

When determining plaintiff's RFC, the ALJ assessed the plaintiff's credibility and rejected her statements concerning her limitations as not completely plausible.  AT 17.  In arriving at that determination the ALJ found that plaintiff's medically determinable impairments reasonably could be expected to produce some of the symptoms and limitations described by her, but that her statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely supported by the record.  AT 17.  Plaintiff contends that the ALJ did not fully consider her allegations of either an inability to sit for prolonged periods of time due to severe chronic neck pain, or an inability to use her hands for keyboarding or fine manipulation due to pain.  Plaintiff further argues that the ALJ failed to consider the sedative effect of her pain medications.  Plaintiff argues that when properly credited, her statements of severe daily pain and debilitating exertional limitations establish that she is incapable of

28

performing work at any exertional level and that she is disabled within the meaning of the Act.

It is well within the discretion of the Commissioner to evaluate the credibility of a claimant's complaints and render an independent judgment in light of the medical findings and other evidence.  *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984); S.S.R. 96-7p, 1996 WL 374186, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements (S.S.A. 1996). "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," all information submitted by a claimant concerning his or her symptoms must be considered.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  To be sure, a claimant's testimony alone carries independent weight; to require a claimant to fully substantiate his or her symptoms with "medical evidence would be both in abrogation of the regulations and against their stated purpose."  *Matejka v. Barnhart*, 386 F.Supp.2d 198, 207 (W.D.N.Y. 2005) (citing *Castillo v. Apfel*, No. 98 CIV. 0792, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

The regulations prescribe a specific process which an ALJ is duty

bound to follow in weighing a claimant's testimony.  The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b).  If the ALJ finds such an impairment, then the ALJ next evaluates the intensity and persistence of the symptoms to determine how the symptoms limit the claimant's functioning.  20 C.F.R. §§ 404.1529(c), 416.929(c).

A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms.  *Barnett v. Apfel*, 13 F. Supp.2d 312, 316 (N.D.N.Y. 1998); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations, then the ALJ must consider additional factors, including: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medications taken to relieve symptoms; (5) other treatment received; and, 6) any other measures

taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi),

416.929(c)(3) (i)-(vi).

After considering plaintiff's subjective testimony, the objective

medical evidence, and any other factors deemed relevant, the ALJ may

accept or reject a claimant's subjective testimony.  *Martone*, 70 F.Supp.2d

at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Although the

ALJ is free to accept or reject such testimony, a "finding that the witness is

not credible must nevertheless be set forth with sufficient specificity to

permit intelligible plenary review of the record."  *Williams v. Bowen*, 859

F.2d 255, 260-61 (2d Cir. 1988) (citation omitted).  Where substantial

evidence supports the ALJ's findings, the decision to discount subjective

testimony may not be disturbed on judicial review.  42 U.S.C. § 405(g);

*Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d

Cir. 1984) (citations omitted).

In assessing plaintiff's credibility, the ALJ fully recited the factors set

forth in 20 C.F.R. §§ 1529(c) and 416.929(c).  Although the ALJ's

subsequent discussion of the factors leading to the partial rejection of

plaintiff's subjective claims is less than comprehensive, it nonetheless

sets forth in summary fashion the basis for that determination, which

draws the support of substantial evidence.  The ALJ acknowledged

plaintiff's testimony that she experiences pain in the back of her neck

traveling into her shoulders most of the time and requires daily pain

medication.  AT 17. The ALJ also noted that plaintiff claims to experience

weakness in her hands, especially in her right hand for which she had

carpal tunnel surgery in 1989.  *Id.*  The ALJ further observed that plaintiff's

asthma and COPD have improved over the last few years and that she

had neither been admitted to any hospital nor received any emergency

room treatment since her alleged disability onset date.  *Id.*

There is evidence in the record to support the ALJ's credibility

determination, including several internal inconsistencies in both plaintiff's

testimony as well as her submissions to the agency.  Plaintiff testified that

she and her husband walk a great deal while in Florida, but soon

thereafter also testified that she had not been able to walk a full block for

close to twenty years.  *Compare* AT 296 *with* AT 298-99.  Similarly, in July

of 2005, plaintiff stated to Dr. Farooq that she had been walking uphill

"with no problems."  AT 215.

Yet another inconsistency is reflected through comparison of

plaintiff's statement in July of 2005 to Dr. Farooq, to the effect that she

can swim several lengths of a swimming pool, with a functional report
completed by her for the agency in that same month, in which she
indicated that she merely "float[s] around" and "tr[ies] to swim."  *Compare*
AT 215 *with* AT 67.  In that same agency submission, plaintiff reported
that she can no longer "wrestle-play with [her] grandchildren," yet in March
of 2006, she admitted to Dr. Seltzer that she has played with her
grandchildren in a "rough manner."  *Compare* AT 58 *with* AT 239.  Plaintiff
also reported in July of 2005 that she is no longer able to "work in the
garden . . . move anything . . . wash wall and windows" and testified that in
June of 2007 that she can no longer vacuum and with respect to meal
preparation, can only "flip an egg."  AT 58, 323.  In July of 2005, however,
plaintiff reported that she launders and hangs her clothes to dry, dusts,
and vacuums a room a day at her residence, shops for groceries, swims,
collects antiques, babysits her grandchildren, and attends dances, AT 60-
62, while in July of 2006, treatment notes from the Lansingburgh Family
Practice indicated that she had "been cleaning [a] flooded basement [the]
past week."  AT 151.

　　　After considering these facts, I conclude that the ALJ's
determination regarding plaintiff's credibility is supported by substantial

evidence.

       3.    <u>Past Relevant Work</u>

At step four of the sequential analysis, the ALJ determined that plaintiff is capable of performing her past relevant work for the New York State Department of Taxation and Finance, which the ALJ characterized as "exertionally sedentary," including as a taxpayer call center service representative, withholding clerk, and payment processor, as she actually performed it in the past.  AT 19.  Based upon that step four finding plaintiff's vocational factors, and whether other work capable of being performed by the plaintiff is available in significant numbers in the national economy, were not under consideration, and the ALJ found that plaintiff was not disabled without making a step five analysis.  *See* 20 C.F.R. § 404.1560.

Plaintiff contends that substantial evidence does not support the ALJ's determination at step four.  Specifically, she asserts that limitations with respect to her abilities to walk, stand, and use her hands preclude her from meeting the exertional demands of sedentary work, requiring reversal of the ALJ's conclusion that she is not disabled.

Reference is made to plaintiff's own descriptions of her various jobs

34

with the New York State Taxation and Finance Department in the ALJ's decision.  AT 19.  As was noted above, plaintiff uniformly described her positions as requiring her to sit for between five and six hours, to stand for between one-half hour and one hour out of the work day, to walk for a one-half hour, and lift ten pounds at most.  AT 47-49, 51.  Plaintiff's description of her work fits comfortably within both the definition of sedentary work and the ALJ's RFC determination, and she has therefore not met her burden of proving that she cannot return to her former work.[14] *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)).

IV.   SUMMARY AND RECOMMENDATION

In arriving at the determination that she was not disabled within the meaning of the Act at the relevant times, the ALJ properly assessed the plaintiff's RFC and credibility and appropriately determined that despite her cervical neck condition, asthma, and COPD, she retains the capacity

---

[14]     As evidence of the inability to perform her past relevant work, plaintiff cites the need to alternate positions when necessary due to her cervical condition. This contention, however, ignores the fact that  "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight."  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

to return to and fully perform her former work.  Accordingly, it is hereby

RECOMMENDED that defendant's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability be AFFIRMED, and plaintiff's complaint DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of Court within ten (10) days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1) (2006); FED.R.CIV.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     October 20, 2009
              Syracuse, NY

David E. Peebles
U.S. Magistrate Judge